UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TROY AND LEA ETTS,

               Plaintiffs,                            Civil Action No.
                                                   4:13-cv-11588

v.

                                            HON. MARK A. GOLDSMITH

DEUTSCHE BANK NATIONAL
TRUST COMPANY, et al.,
               Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS (Dkt. 47)

### I. INTRODUCTION

This is a mortgage foreclosure case. In their second amended complaint, Plaintiffs Troy and Lea Etts accuse Defendants of fraudulent misrepresentation and promissory estoppel based on alleged promises to (i) review Plaintiffs' financial eligibility for a loan modification and (ii) abstain from conducting a foreclosure sale during the review period, among other things.

Defendants have filed a joint motion to dismiss (Dkt. 47). Plaintiffs filed a response (Dkt. 50), and Defendants filed a reply (Dkt. 51). The Court heard oral argument on July 1, 2015, and took the matter under advisement. As discussed below, the Court concludes that Plaintiffs have failed to state a claim for fraudulent misrepresentation, and their claim for promissory estoppel cannot proceed as to most of the alleged oral and written promises at issue. However, the Court concludes that Plaintiffs have stated a claim sufficient to survive a motion to dismiss regarding Defendant Ocwen Loan Servicing, LLC's September 1, 2012 promise to adjourn the foreclosure sale. Accordingly, the Court grants in part and denies in part Defendants' motion to dismiss.

## II. BACKGROUND

In November 2003, Plaintiffs obtained a loan from New Century Mortgage Corporation ("New Century") to refinance the purchase of their home located in Temperance, Michigan. Second Am. Compl. ¶ 6 (Dkt. 46).  Plaintiffs also executed a mortgage in favor of New Century, which was recorded in the Monroe County Register of Deeds.  Id.  Plaintiffs and a representative of Defendant Deutsche Bank National Trust Company ("Deutsche Bank") subsequently signed a loan modification agreement.[1]  The effective date of that agreement is unclear; Plaintiffs appear to have signed the document in November 2006, but the Deutsche Bank representative appears not to have executed it until February 21, 2008.  See id.

In 2009, Plaintiffs faced financial difficulty due to Troy Etts's health and employment status.  Id. ¶ 7.  Plaintiffs requested that their then-loan-servicer, Litton Loan Servicing ("Litton"), grant them a loan modification.  Id.  In response, Litton sent Plaintiffs a "Loan Workout Plan" in May 2009.  Id. ¶ 8.  In the cover letter to that document, Litton informed Plaintiffs that "[i]f [they] qualify for this modification and comply with the terms of the Workout Plan, [Litton] will modify [their] mortgage loan and [they] can avoid foreclosure."  See 5/11/2009 Cover Letter (Dkt. 46-4 (pages 2-3 of 16 (cm/ecf pages))).  Litton also sent Plaintiffs a list of documents they had to submit in support of their modification request, including recent pay stubs, tax documents, etc.  One of the documents — a financial hardship affidavit — required Plaintiffs to acknowledge that they understood that "the Servicer will use this information to evaluate [their] eligibility for a loan modification or other workout, but the

---

[1] Neither the second amended complaint nor the documents currently before the Court reflect how Deutsche Bank and/or the trust for which Deutsche Bank was the trustee obtained an interest in the note and/or mortgage before the loan modification agreement was signed.

Servicer is not obligated to offer [them] assistance based solely on the representations in this affidavit." Hardship Aff. (Dkt. 46-4 (pages 5-6 of 16 (cm/ecf pages))).

Litton also sent Plaintiffs a list of frequently asked questions. One of those questions addressed the effect of the Loan Workout Plan on foreclosure proceedings:

> As long as you comply with the terms of the Workout Plan, we will not start foreclosure proceedings or conduct a foreclosure sale if foreclosure proceedings have started. If you fail to comply with the terms of the Workout Plan and do not make other arrangements, your loan will be enforced according to its original terms, which could include foreclosure.

FAQs (Dkt. 46-4 (9 of 16 (cm/ecf page))).

Plaintiffs allege that they provided all of the requested documents, including two signed copies of the Loan Workout Plan, thereafter. Second Am. Compl. ¶ 12. Plaintiffs also claim that they made the required monthly trial period payments. Id. ¶ 13. However, Plaintiffs maintain that Litton repeatedly requested additional documentation, falsely claiming that the original documents had not been received, were outdated, or were incomplete. Id. ¶¶ 14-17. According to Plaintiffs, these requests for additional documents continued until October 2010. Id. ¶ 17.

In January 2011, Litton sent Plaintiffs a letter advising them that a modification could not be offered, because Plaintiffs had received an earlier modification in 2006. Id. ¶ 26. Plaintiffs maintain that in denying them the requested modification, Litton never considered Plaintiffs' financial eligibility for a modification, nor did it try and obtain a waiver of the investor restriction prohibiting second modifications. Id.; see also 1/12/2011 Letter (Dkt. 46-7 (page 2 of 5 (cm/ecf page))); 4/29/2011 Letter (Dkt. 46-7 (pages 4-5 of 5 (cm/ecf pages))).[2]

---

[2] In April 2011, Litton sent a letter to the State of Michigan's Office of Financial and Insurance Regulation regarding Plaintiffs' requests to modify their loan. See 4/29/2011 Letter. The letter explained that: (i) Plaintiffs' loan had been modified on December 11, 2006; (ii) Litton initiated a review of the loan for a second modification in April 2009 based on Plaintiffs' request;

Nevertheless, Plaintiffs claim that despite being denied due to investor restrictions, Litton — and ultimately Defendant Ocwen, as successor to Litton as servicer for the loan — continued to solicit documents from Plaintiffs to determine whether some type of modification was possible.   Second Am. Compl. ¶¶ 27-29.   Plaintiffs allege that they submitted the required documents for a review.   See id. ¶ 37.   Plaintiffs also assert that they were promised that the foreclosure sale would be adjourned during the review process.   Id. ¶¶ 29, 37.   For example, Plaintiffs identify a letter from Ocwen sent in September 2012, which contains the following statement:

> While we consider your request [for a modification], we will not initiate a new foreclosure action and we will not move ahead with the foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements.

9/1/2012 Letter (Dkt. 50-4); see also Second Am. Compl. ¶¶ 29, 37.   However, according to Plaintiffs, Defendants "proceeded to foreclose on Plaintiffs [sic] property, executing a sale and 'purchasing' Plaintiffs' property through a credit bid on October 25, 2012."   Id. ¶ 29.

Plaintiffs originally alleged that Defendants: (i) did not have the right to foreclose, given the bankruptcy of the original mortgagee; (ii) promised Plaintiffs a loan modification via the Loan Workout Plan; and (iii) acted wrongfully under the Fair Debt Collection Practices Act, 15 U.S.C. §§ 1692e, 1692f ("FDCPA"), by posting an affidavit of abandonment during the redemption period.   Am. Compl. (Dkt. 11).   After Defendants filed motions to dismiss (Dkts. 14, 15), the Court dismissed these claims, finding that Plaintiffs: (i) had not alleged prejudice;

---

(iii) Litton did not receive all of the required documentation, resulting in a denial of the loan modification request in September 2009; and (iv) Litton initiated new reviews in October 2010 and January 2011 based on updated documents it received from Plaintiffs, but Litton concluded that a modification could not be granted because the investor only allowed the loan to be modified once after April 1, 2004.   Id.

(ii) had abandoned the claim of a promise for a loan modification, instead turning it into a claim that Defendants promised to review Plaintiffs for a loan modification; and (iii) had no basis for relief under the FDCPA for the posting of the affidavit.  See 2/19/2014 Op. & Order (Dkt. 34). However, the Court allowed Plaintiffs to seek leave to file an amended complaint to cure some of these defects.  Id.

Plaintiffs now bring two claims in their second amended complaint: promissory estoppel and fraudulent misrepresentation (Dkt. 46).  The underlying focus of these claims is: (i) purported promises to review Plaintiffs' financial eligibility for a loan modification, see id. ¶¶ 36, 42-43, 50-52, and (ii) alleged promises not to hold a foreclosure sale during the review process, id. ¶¶ 29, 37, 51.  Defendants responded by filing the instant motion to dismiss.

### III.  STANDARD FOR MOTION TO DISMISS

The Court set forth the standard for reviewing a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6) in an earlier decision in this case:

> Federal Rule of Civil Procedure 12(b)(6) allows a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  In evaluating a motion to dismiss pursuant to Rule 12(b)(6), "[c]ourts must construe the complaint in the light most favorable to plaintiff, accept all well-pled factual allegations as true, and determine whether the complaint states a plausible claim for relief."  Albrecht v. Treon, 617 F.3d 890, 893 (6th Cir. 2010) (internal brackets, quotation marks, and citations omitted).  To survive a motion to dismiss, a complaint must plead specific factual allegations, and not just legal conclusions, in support of each claim.  Ashcroft v. Iqbal, 556 U.S. 662, 678-679 (2009).  A complaint will be dismissed unless, when all well-pled factual allegations are accepted as true, the complaint states a "plausible claim for relief."  Id. at 679.
>
> In ruling on a motion to dismiss, the Court may consider the entire complaint, documents incorporated by reference in the complaint and central to the claims, and matters on which a court may take judicial notice.  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  "[I]f a factual assertion in the

pleadings is inconsistent with a document attached for support, the Court is to accept the facts as stated in the attached document." <u>Williams v. CitiMortgage, Inc.</u>, 498 F. App'x 532, 536 (6th Cir. 2012) (citation omitted).

2/19/2014 Op. & Order at 4-5 (Dkt. 34).

## IV.   ANALYSIS

The Court addresses each of Plaintiffs' causes of action — for fraudulent misrepresentation and promissory estoppel — in turn.

## A.  Fraudulent Misrepresentation

With respect to their claim for fraudulent misrepresentation, Plaintiffs allege that Defendants made "false, fraudulent and misleading representations of material fact and/or made the representations in utter disregard of the truth, verbally and in writing when it [sic] promised to review the Plaintiffs [sic] eligibility for a loan modification."   Second Am. Compl. ¶ 50. Plaintiffs also allege that Defendants promised not to hold a foreclosure sale while the loan modification review was underway.   <u>Id.</u> ¶ 51; <u>see also</u> Pls. Resp. at 18 ("[D]efendant made a material representation (i.e. evaluation of the eligibility of the Plaintiffs for a loan modification or other workout would be undertaken, . . . [and] that no foreclosure proceedings would be commenced if Plaintiffs complied with the Plan").

Defendants argue that a claim for fraudulent misrepresentation based on these statements cannot stand, because the statements constitute future promises, not statements about present or past fact.  Therefore, Defendants suggest that this cause of action is really just another claim for promissory estoppel.   Defs. Br. at 5-6.   Plaintiffs respond that the "bad-faith exception to fraudulent misrepresentation applies."  Pls. Resp. at 19-20.

A claim for fraudulent misrepresentation under Michigan law "must be predicated upon a statement relating to a past or an existing fact.  Future promises are contractual and do not

6

constitute fraud." Hi-Way Motor Co. v. Int'l Harvester Co., 247 N.W.2d 813, 816 (Mich. 1976). There is a "bad-faith exception" to this rule, however, if the "promise [was] made in bad faith without intention of performance." Id.

Promises to review a loan for modification and not to foreclose during this review constitute future promises, rather than statements relating to a past or an existing fact. Therefore, these statements cannot support a claim for fraudulent misrepresentation, absent the application of the bad-faith exception. See Davis v. PNC Mortg., No. 13-11737, 2014 WL 4801968, at *7-8 (E.D. Mich. Sept. 23, 2014) (allegation that the plaintiff was promised a future loan modification not actionable as fraud, unless the bad-faith exception applied); Maltbie v. Bank of Am., No. 12-1002, 2013 WL 6078945, at *5 (W.D. Mich. Nov. 19, 2013); Barter v. U.S. Bank, N.A., No. 10-11476, 2011 WL 124502, at *3 (E.D. Mich. Jan. 13, 2011) (statement that home was not being foreclosed upon during loan modification process could not support claim for fraudulent misrepresentation, because it was a "future promise[] regarding what [the servicer] will or will not do"); Lessl v. CitiMortgage, Inc., 515 F. App'x 467, 470 (6th Cir. 2013). Although Plaintiffs argue in response to Defendants' motion that Defendants had no intention of reviewing Plaintiffs for a modification or abstaining from foreclosing at the time these purported promises were made, Pls. Resp. at 19-20, no such allegation appears in the second amended complaint. Indeed, the words "intent," "intention," "bad faith," or some variant thereof are not contained anywhere in the governing pleading.[3] Therefore, the Court finds that Plaintiffs have not sufficiently pled that this exception applies.

---

[3] Notably, although Plaintiffs highlight purported facts that they claim support an inference of Defendants' intention not to perform, see Pls. Resp. at 19-20, Plaintiffs cite no paragraph of their second amended complaint specifically alleging that Defendants had this intention.

This is Plaintiffs' third complaint in this case; the Court has given Plaintiffs two previous opportunities to amend over the course of this litigation.  See 5/28/2013 Order (Dkt. 6); 2/19/2014 Op. & Order (Dkt. 34).  The Court is not inclined to give Plaintiffs a third bite at the apple.  Plaintiffs have not sufficiently set forth in their pleading a claim that the bad-faith exception applies to Defendants' alleged promises to review Plaintiffs' financial eligibility for a loan modification and to abstain from foreclosing while doing so.  Consequently, the claim for fraudulent misrepresentation cannot stand to the extent it is based on these purported future promises.

Although the above future promises form the bulk of Plaintiffs' second amended complaint, Plaintiffs cursorily mention three other statements that they suggest support a claim for fraudulent misrepresentation: (i) that their loan had been "previously modified under the Home Affordable Modification Program ["HAMP"]," Second Am. Comp. ¶¶ 51, 53; (ii) that investor restrictions precluded granting an additional or second modification, id. ¶ 51-52; and (iii) that Defendants had not received the required documents for the review, despite documentation to the contrary, id. ¶ 49.

To state a claim for fraudulent misrepresentation under Michigan law, Plaintiffs must sufficiently allege the following: "(1) That defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." Hi-Way Motor Co., 247 N.W.2d at 816.

The Court is not persuaded that Plaintiffs have sufficiently set forth these factors to survive a motion to dismiss.  Regarding the statements about the reasons for the loan-

8

modification denial — namely the prior modification — although Litton may have been incorrect that Plaintiffs had previously been granted a <u>HAMP</u> modification (as opposed to another type of modification), <u>see</u> 4/29/2011 Letter (acknowledging this error), Plaintiffs do not explain how they relied on this misstatement. Nor do Plaintiffs explain how they relied to their detriment on an allegedly inaccurate statement that the investor restrictions precluded granting an additional or second modification. Plaintiffs do not claim that these statements induced them to take or refrain from taking any particular action. For example, Plaintiffs do not claim that they discontinued seeking a loan modification after receiving these reasons for the denial. To the contrary, Plaintiffs specifically allege that they continued to seek a loan modification up to and including September 1, 2012. <u>See</u> Second Am. Compl. ¶ 29.

The reliance Plaintiffs do allege in the second amended complaint is as follows:

> Plaintiffs relied upon the false, fraudulent and misleading representations of material fact and/or made the representations in utter disregard of the truth to their detriment as their property was nonetheless foreclosed upon and they lost the opportunity to pursue other loss mitigation opportunities to save their home, such as seeking another type of loan modification, refinancing the existing loan, pursuing a short sale, restructuring under the bankruptcy code or renting the property and relocating . . . .

Second Am. Compl. ¶ 55. Yet, this reliance makes no sense with respect to a claim concerning purported misstatements about the reasons for the loan-modification denial. Plaintiffs do not explain how a false statement that the modification was denied due to a previous HAMP modification — as opposed to a non-HAMP modification — caused them to "los[e] the opportunity to pursue other mitigation opportunities." Rather, this alleged reliance appears targeted toward Plaintiffs' claims regarding the alleged promises to review and adjourn the foreclosure sale.

Further exemplifying the mismatch between Plaintiffs' claimed reliance and the purported fraud concerning the reasons for the denial is the passage of time between the alleged statements and the foreclosure sale. The statements at issue regarding Plaintiffs' past modification and the investor restrictions are contained in a January 12, 2011 letter sent to the Plaintiffs. See 1/12/2011 Letter (Dkt. 46-7). But the foreclosure sale did not occur until October 25, 2012. Second Am. Compl. ¶ 29. Plaintiffs fail to explain how two statements about the reason(s) for a loan modification denial — made over a year and a half before the foreclosure sale — caused them to "los[e] the opportunity to pursue other loss mitigation opportunities" during this period in between. To the contrary, the "los[s] of opportunity to pursue other loss mitigation opportunities" as the alleged reliance in this case only makes sense in context of Plaintiffs' claims regarding the alleged promises to review their financial eligibility and adjourn the foreclosure sale — claims that cannot form the basis for Plaintiffs' claim for fraudulent misrepresentation, as discussed earlier.

With respect to the remaining purported statement about the servicer not having received the necessary documents, Plaintiffs fail to set forth the alleged injury arising out of this alleged misrepresentation. Plaintiffs do not provide any basis for recovering or calculating compensatory damages — such as seeking compensation for time spent re-gathering documents, costs of copying, etc. And to the extent Plaintiffs are seeking to have the foreclosure sale rescinded based on this statement, the time to obtain this type of relief ended with the expiration of the redemption period, because this claim relates to the servicing of the loan, rather than a fraud or irregularity arising out of the foreclosure process. Campbell v. Nationstar Mortg., -- F. App'x --, 2015 WL 2084023, at *5 (6th Cir. 2015) ("An alleged irregularity in the loan modification process . . . does not constitute an irregularity in the foreclosure proceeding.").

Moreover, Plaintiffs fail to explain how an alleged misrepresentation regarding the receipt of documents should result in the rescission of the foreclosure sale, when Plaintiffs fail to sufficiently allege that they would have qualified for a loan modification if the documents had been reviewed, as described below.

Accordingly, the Court dismisses Plaintiffs' claim for fraudulent misrepresentation.

## B.  Promissory Estoppel

Like their claim for fraudulent misrepresentation, Plaintiffs' claim for promissory estoppel centers on two alleged promises: (i) to review Plaintiffs' financial eligibility for a loan modification and (ii) to abstain from foreclosing during this review.  The Court now considers whether Plaintiffs have stated a claim for promissory estoppel based upon each promise.

### i.  Promise to Review Financial Eligibility

As described above, Plaintiffs' second amended complaint challenges Defendants' review of Plaintiffs' request for a loan modification.  Plaintiffs recognize that their request was denied purportedly due to investor restrictions allowing only one loan modification, whereas Plaintiffs were requesting a second modification.  Second Am. Compl. ¶ 26.  However, Plaintiffs allege that Defendants promised to consider their <u>financial</u> eligibility for a modification — and, indeed, solicited financial documents from Plaintiffs while promising to review them — but never actually undertook such a review.  Plaintiffs further suggest that Defendants never attempted to obtain an exception to the investor restriction on second modifications.  <u>Id.</u> ¶¶ 18-20, 26-29.

Defendants argue that Michigan's statute of frauds bars Plaintiff from raising these claims.  Defs. Br. at 6-12.  Plaintiffs briefly respond that the statute of frauds does not apply here, because Plaintiffs only assert that Defendants promised to <u>consider</u> them for a loan

modification, not that Defendants promised to <u>grant</u> Plaintiffs a loan modification.  Pls. Resp. at

14 (distinguishing <u>Goss v. ABN AMRO Mort. Grp.</u>, 549 F. App'x 466 (6th Cir. 2013)).

      The Court rejects Plaintiffs' argument, given the breadth with which the statute of frauds

was intended to be applied with respect to financial institutions.  Michigan's statute of frauds for

financial institutions provides, as follows:

> An action shall not be brought against a financial institution to
> enforce any of the following promises or commitments of the
> financial institution unless the promise or commitment is in writing
> and signed with an authorized signature by the financial institution:
>
> (a) A promise or commitment to lend money, grant or extend
> credit, or make any other financial accommodation.
>
> (b) A promise or commitment to renew, extend, modify, or permit
> a delay in repayment or performance of a loan, extension of credit,
> or other financial accommodation.
>
> (c) A promise or commitment to waive a provision of a loan,
> extension of credit, or other financial accommodation.

<u>See</u> Mich. Comp. Laws 566.132(2).[4]

      A promise to consider a borrower for a loan modification is the functional equivalent of a

promise "to permit" a "financial accommodation" — <u>i.e.</u>, considering the modification request is

the financial accommodation.  <u>See</u> <u>Barclae v. Zarb</u>, 834 N.W.2d 100, 111 (Mich. Ct. App. 2013)

(statute of frauds applies to "an accommodation that would be made by a lender or creditor," <u>i.e.</u>,

"an accommodation pertaining to those engaged in dealing with money and credit").  Therefore,

to avoid having their claims barred by the statute of frauds, Plaintiffs must identify a written,

signed promise.  Any claims based on oral promises to review are barred.  <u>See</u> <u>Meyer v.</u>

<u>Citimortgage, Inc.</u>, No. 11-13432, 2012 WL 511995, at *10 (E.D. Mich. Feb. 16, 2012)

---

[4]  Plaintiffs do not dispute that Litton and the Defendants qualify as "financial institutions" under
the statute of frauds.  <u>See</u> Mich. Comp. Laws § 566.132(3).

(dismissing promissory estoppel claim based on the defendant's purported "unwritten agreement . . . to consider plaintiffs for a loan modification" given statue of frauds); <u>Wallace v. GMAC Mortg., LLC</u>, No. 12-13032, 2013 WL 1090614, at *6-7 (E.D. Mich. Feb. 22, 2013) (Majzoub, M.J.) (same) <u>adopted</u> <u>by</u> 2013 WL 1090706 (E.D. Mich. Mar. 15, 2013); <u>Reed v. BAC Home Loans Servicing, LP</u>, No. 11-963, 2012 WL 1579340, at *1 (W.D. Mich. May 4, 2012) ("[T]o the extent that the Reeds are seeking to enforce an oral statement by BANA allegedly promising to review their loan modification, Michigan's statute of frauds bars the Reeds' claim.").

While Plaintiffs claim that Litton and Ocwen repeatedly solicited the submission of financial documents for the purpose of considering Plaintiffs for a loan modification, the only written documents Plaintiffs identify with particularity in their pleading as containing a promise that Plaintiffs financial eligibility would be considered are the May 2009 Loan Workout Plan and attached documents, a purported October 2010 letter from Litton, and a September 2012 letter from Ocwen.[5] <u>See</u> Second Am. Compl. ¶¶ 8-11, 32-36 (describing the May 2009 Loan Workout Plan documents); <u>id.</u> ¶¶ 29, 37 (describing the September 1, 2012 letter).

With respect to the 2009 documents, Plaintiffs highlight the following statement from the May 2009 Financial Hardship Affidavit:

> "I/we understand that the Servicer will use this information to evaluate my/our eligibility for a loan modification or other workout."

---

[5]   Plaintiffs allege that Litton "variously, continuously and repeatedly made verbal and written representations to Plaintiffs' [sic] throughout its ongoing solicitation of documents that it would review these submissions to evaluate Plaintiffs' eligibility for a loan modification." Second Am. Compl. ¶ 38.  However, the only written documents containing such a purported promise that Plaintiffs identify with particularity are those identified above.  To the extent Plaintiffs allege other such written documents exist, they have failed to identify these with the particularity required by Federal Rule of Civil Procedure 8.

Financial Hardship Aff. ¶ 8 (Dkt. 46-4 (page 6 of 16 (cm/ecf page))); Second Am. Compl. ¶ 11. Plaintiffs also rely upon a statement from the May 2009 cover letter, which states as follows: "Step 1[:]  Provide the Info We Need to Help You."  5/11/2009 Cover Letter (Dkt. 46-4 (page 2 of 16 (cm/ecf page))); Second Am. Compl. ¶ 9.

Plaintiffs further claim that they received a letter from Litton in October 2010 "represent[ing that] [Litton] would initiate a review of [submitted] documentation to determine if the loan qualified for a modification."  Second Am. Compl. ¶ 20; see also id. ¶¶ 43, 50.  Finally, in response to Defendants' motion to dismiss, Plaintiffs attached the September 1, 2012 letter from Defendant Ocwen, which includes the following statement:

> We will conduct a thorough review of your financial situation, and first verify for your eligibility for the HAMP program.  If HAMP doesn't apply to your loan, we will work to match your situation to our own mortgage modification and assistance programs.

9/1/2012 Correspondence (Dkt. 50-4); Second Am. Compl. ¶ 29.

The Court concludes that these statements are insufficient to state a claim for promissory estoppel based upon a purported failure to consider Plaintiffs' financial eligibility for a loan modification.  Under Michigan law, the elements of a claim for promissory estoppel are as follows: "(1) a promise, (2) that the promisor should reasonabl[y] have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided."  Lessl, 515 F. App'x at 470 (quoting Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 552 (Mich. Ct. App. 1999)).  Courts apply the doctrine of promissory estoppel cautiously.  See Lessl v. CitiMortgage Inc., No. 11-10871, 2011 WL 4351673, at *7 (E.D. Mich. Sept. 16, 2011).

Here, Plaintiffs' claim based on the 2009 documents fails because Plaintiffs have not sufficiently alleged why the promise "must be enforced if injustice is to be avoided." Plaintiffs point to no language promising that Defendants would consider their eligibility in a vacuum, ignoring any restrictions aside from financial eligibility. And Plaintiffs acknowledge that Defendants determined that Plaintiffs were ineligible for a loan modification due to investor restrictions. Second Am. Compl. ¶ 26. Plaintiffs do not allege that such an investor restriction did not exist, nor — as explained below — do Plaintiffs affirmatively allege that they were financially entitled to a modification. Therefore, Plaintiffs have failed to explain how they were harmed by Defendants' purported decision not to review their financial documentation, an exercise that may have been futile in light of the investor restrictions imposed upon the servicer's ability to offer a second or additional modification. See Hart v. Countrywide Home Loans, Inc., 735 F. Supp. 2d. 741, 749 (E.D. Mich. 2010) ("[R]eliance on a promise that Defendant would review Plaintiff's mortgage for modification could not cause an injury in this case where . . . Plaintiff is not entitled [to] modification regardless of her eligibility under the Lending Statutes.").

Plaintiffs cite a HAMP supplemental directive as evidence that Defendants were required to consider their financial eligibility when making a modification determination. See Supp. Directive 09-01 (Dkt. 46-6); Second Am. Compl. ¶¶ 23-26. Pursuant to that directive, loan modifications "must" be offered if certain financial calculations result in a positive net present value. However, with respect to the May 2009 Loan Workout Plan documents, it is undisputed that Litton was not a part of the HAMP program at the time the purported written promise was made, and, therefore, the supplemental directive for HAMP modifications would not have applied. See Second Am. Compl. ¶ 20; see also 4/29/2011 Letter ("Litton did not begin formal

15

participation in the HAMP until August 2009.").  Therefore, to the extent this claim is based on

the May 2009 documents, it cannot be supported by reference to the HAMP guidelines.[6]

Plaintiffs further suggest that Defendants failed to request an exception to the one-

modification rule set forth by the investor guidelines.  See Second Am. Compl. ¶ 26.  The

HAMP supplemental directive on which Plaintiffs rely instructs servicers to "use reasonable

efforts to remove any prohibitions and obtain waivers or approvals from all necessary parties in

order to carry out any modification under the HAMP."  Supp. Directive 09-01 (Dkt. 50-2).

However, although the supplemental directive may have instructed Litton to undertake such

efforts, Plaintiffs do not claim that Litton ever promised this to them or even stated that it would

do so.  Therefore, without such an explicit promise or statement being made to them, Plaintiffs'

claims for promissory estoppel cannot survive.

Finally, even if the HAMP Supplemental Directive is applicable to Plaintiffs' claims,

Plaintiffs fail to sufficiently allege injury resulting from the purported promise (and subsequent

failure) to review their financial eligibility for a loan modification.  Plaintiffs claim that they

---

[6]  Moreover, despite Plaintiffs' protestations to the contrary, the HAMP guidelines do not require
servicers to ignore investor directives regarding granting modifications.  See In re Pulsifer, No.
13-648, 2014 WL 4748233, at *5 (E.D. Wis. Sept. 23, 2014) ("Indeed, investor approval is
required, and even a positive NPV value does not guarantee a modification."); Edwards v.
Aurora Loan Servs., LLC, 791 F. Supp. 2d 144, 148-149 (D.D.C. 2011) ("HAMP guidelines do
not require servicers to consider loans for HAMP modification where prohibited by the rules of
the applicable PSA and/or other investor servicing agreements."); Williams v. Geithner, No. 09-
1959, 2009 WL 3757380, at *2 (D. Minn. Nov. 9, 2009) ("The Treasury Guidelines explain that
'participating servicers are required to consider all eligible mortgage loans unless prohibited by
the rules of the applicable [pooling and servicing agreement] and/or investor servicing
agreements. . . . Therefore, although an applicant may be eligible in the sense of meeting the
threshold criteria, servicers are not required to modify a loan with a negative NPV or if otherwise
prohibited by the investor."); see also Supp. Directive 09-01 (Dkt. 50-2 (page 2 of 27 (cm/ecf
page))) ("[P]articipating servicers are required to consider all eligible mortgage loans unless
prohibited by the rules of the applicable PSA and/or other investor servicing agreements.
Participating servicers are required to use reasonable efforts to remove any prohibitions and
obtain waivers or approvals from all necessary parties in order to carry out any modification
under the HAMP.").

relied on the purported promises to review their financial eligibility "to their detriment as . . . their home was foreclosed upon and they forewent other opportunities to save their home, such as seeking another type of loan modification, refinancing the existing loan, pursuing a short sale, restructuring under the bankruptcy code[,] or renting the property and relocating."  Second Am. Compl. ¶ 45.  However, Plaintiffs fail to allege that they would have been granted a loan modification had Defendants considered their financial eligibility.  See id. ¶ 26 (claiming that a waiver of investor restrictions is only required if the net present value is negative, and that it "remains unknown whether a waiver of investor restrictions was even required").[7]  Nor do Plaintiffs claim in their second amended complaint or in their response to Defendants' motion that the investor would have granted an exception to the one-modification restriction if requested.

If Plaintiffs were not eligible for a modification even with a review of their financial information, then their decision to forego other possible options while the review was underway would have been irrelevant; Plaintiffs do not allege that they would have been in a different position, vis-à-vis the opportunity to pursue alternative remedies, had Defendants never made the alleged promise in the first place.  Indeed, if anything, the alleged promises allowed Plaintiffs to remain in their home longer and/or gave more time for Plaintiffs to seek other possible options while the review was allegedly underway.  The asserted harms are, therefore, wholly speculative,

---

[7]  Plaintiffs do claim in their response that they would have qualified for a modification.  Pls. Resp. at 9, 25.  However, this allegation does not appear in the governing complaint, and Plaintiffs' response cannot remedy this defect.  See Botsford v. Bank of Am., N.A., No. 13-13379, 2014 WL 4897529, at *11 (E.D. Mich. Sept. 30, 2014) ("Plaintiff cannot correct a faulty claim in his First Amended Complaint through a response to Defendant's motion."); Jocham v. Tuscola Cnty., 239 F. Supp. 2d 714, 732 (E.D. Mich. 2003).  Indeed, Plaintiffs suggest in their second amended complaint that they do not know if they would have qualified for a loan modification based on their financial eligibility.  See Second Am. Compl. ¶ 25-26.

particularly given Plaintiffs' failure to affirmatively allege that they would have been granted a modification had the proper review been completed.

The Court concludes that Plaintiffs have not sufficiently alleged definite harm, such that "the promise must be enforced if injustice is to be avoided." Lessl v. CitiMortgage, Inc., 515 F. App'x 467, 470 (6th Cir. 2013) (citation omitted). Accordingly, Plaintiffs have not sufficiently pled their claim for promissory estoppel based on the purported promise to consider their financial eligibility for a modification.

### ii.  Promise to Adjourn Foreclosure Sale Pending Review

Plaintiffs next claim that Defendants are liable under a theory of promissory estoppel because Defendants promised not to foreclose during the modification review process, but did so anyway. See Second Am. Compl. ¶¶ 37, 44. Defendants argue that this claim is barred by the statute of frauds, and, alternatively, that Plaintiffs cannot sufficiently allege reliance on these purported promises to survive a motion to dismiss. Defs. Br. at 6-12, 14-16.

The Court first finds that the statute of frauds applies to Plaintiffs' claimed promises not to conduct a foreclosure sale. Michigan's statute of frauds provides, as pertinent here, that "[a]n action shall not be brought against a financial institution to enforce any of the following promises or commitments of the financial institution unless the promise or commitment is in writing and signed with an authorized signature by the financial institution: . . . (b) A promise or commitment to renew, extend, modify, or permit a delay in repayment or performance of a loan, extension of credit, or other financial accommodation[; or] (c) A promise or commitment to waive a provision of a loan, extension of credit, or other financial accommodation." Mich. Comp. Laws § 566.132(2). In FEI Co. v. Republic Bank, S.E., the Michigan Court of Appeals concluded that "an agreement to delay a foreclosure sale is an agreement to make a financial accommodation" under the statute of frauds. See No. 268700, 2006 WL 2313612, at *2 (Mich.

18

Ct. App. Aug. 10, 2006).  Other courts have agreed.  See, e.g., Williams v. Pledged Prop. II, LLC, 508 F. App'x 465, 469 (6th Cir. 2012).

Here, Plaintiffs claim that they were promised that the foreclosure sale would be delayed pending review of their loan modification request.  Second Am. Compl. ¶¶ 37, 44.  Therefore, the statute of frauds applies; any claims based on oral or unsigned promises to adjourn the foreclosure sale are barred.

Plaintiffs identify four writings that they claim contain promises to adjourn that satisfy the statute of frauds: (i) the Frequently Asked Questions included with the May 2009 Loan Workout Plan; (ii) a purported "Litton correspondence dated January 5, 2011," (iii) a notice sent by Defendant Ocwen in November 2012; and (iv) a communication from Ocwen from September 2012.  Second Am. Compl. ¶¶ 29, 37.  With respect to the first three items, the Court concludes that even if these writings contain the necessary signatures to satisfy the statute of frauds — a question the Court need not decide — they fail to support Plaintiffs' claim for promissory estoppel.

As described earlier, the elements of a claim for promissory estoppel are as follows: "(1) a promise, (2) that the promisor should reasonabl[y] have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that in fact produced reliance or forbearance of that nature in circumstances such that the promise must be enforced if injustice is to be avoided."  Lessl, 515 F. App'x at 470 (quoting Novak v. Nationwide Mut. Ins. Co., 599 N.W.2d 546, 552 (Mich. Ct. App. 1999)).

Plaintiffs' reliance on the Frequently Asked Questions included with the May 2009 Loan Workout Plan is misplaced.  This document did inform Plaintiffs that "[a]s long as [they] comply with the terms of the Workout Plan, [the servicer would] not start foreclosure proceedings or

19

conduct a foreclosure sale if foreclosure proceedings have started." FAQs (Dkt. 46-4 (page 9 of 16 (cm/ecf page))). But Plaintiffs acknowledge that by at least January 2011, and possibly earlier, Defendants had denied Plaintiffs' request for a loan modification under the 2009 Loan Workout Plan. Second Am. Compl. ¶ 26. And the foreclosure sale did not occur until nearly two years later. Id. ¶ 29. Therefore, Defendants did comply with their promise not to foreclose during the May 2009 Loan Workout Plan review process; Defendants did not foreclose until well after that review had been denied. Plaintiffs' reliance on the accompanying 2009 Frequently Asked Questions to establish a claim for promissory estoppel is, consequently, without merit.

Plaintiffs next claim that a similar promise to abstain from foreclosing was set forth in a "Litton correspondence dated January 5, 2011." Second Am. Compl. ¶ 37. But Plaintiffs do not identify the language of this document or the alleged promise contained therein with particularity; nor do Plaintiffs attach any such document to their second amended complaint. This alone is grounds for rejecting Plaintiffs' reliance on this vague document. See Northampton Rest. Grp. v. FirstMerit Bank, N.A., 492 F. App'x 518, 521-522 (6th Cir. 2012) (dismissing breach of contract claim where plaintiff did not set forth the terms of the contract breached, nor attach the contract to the complaint); Charter Twp. of Ypsilanti v. Gen. Motors Corp., 506 N.W.2d 556, 559 (Mich. Ct. App. 1993) ("Promissory estoppel requires an actual, clear, and definite promise."); see also 2/19/2014 Op. & Order at 19 n.5 (Dkt. 34) (requiring Plaintiffs to set forth the alleged promises with particularity).

To the extent Plaintiffs meant to rely on Litton's January 12, 2011 correspondence (Dkt. 46-7 (pages 2-3 of 5 (cm/ecf pages))), the Court has reviewed that document and finds no language clearly promising to adjourn the foreclosure sale. To the contrary, that document specifically warned Plaintiffs that "[i]f foreclosure action has begun, it will continue until you

make arrangements with us."  Id.  Further, as Defendants highlight, any such promise contained within the January 12, 2011 letter would have lapsed by the time of the sale, as Plaintiffs acknowledge that Defendants had completed this review by, at latest, April 2011.  See Second Am. Compl. ¶ 39; see also 4/29/2011 Correspondence (Dkt. 46-7 (page 5 of 5 (cm/ecf page))).

Third, Plaintiffs rely on a form letter that was sent to them by Ocwen on or around November 21, 2012.  See Second Am. Compl. ¶ 37; see also 11/21/2012 Correspondence (Dkt. 46-8).  That letter states, "While we consider your request [for a modification], we will not initiate a new foreclosure action and will not move ahead with the foreclosure sale on an active foreclosure as long as we have received all required documents and you have met the eligibility requirements."  See 11/21/2012 Correspondence.  The letter also warned, as follows:

> The HAMP evaluation and the process of foreclosure may proceed at the same time.  You may receive foreclosure/eviction notices – delivered by mail or in person – or you may see steps being taken to proceed with a foreclosure sale of your home.  While you will not lose your home during the HAMP evaluation, to protect your rights under applicable foreclosure law, you may need to respond to these foreclosure notices or take other actions.

Id.

Plaintiffs acknowledge that this notice was sent after the foreclosure sale had already been completed.  See Second Am. Compl. ¶ 37.  Moreover, Plaintiffs alleged in an earlier complaint that they "learned of the sale of their home when, on November 5, 2012, an 'Affidavit of Abandonment' . . . was found posted on their front door."  Am. Compl. ¶ 12 (Dkt. 11).  This Affidavit of Abandonment was, therefore, posted more than two weeks before Plaintiffs received the above form letter from Ocwen.  Accordingly, the Court finds that, as a matter of law, Plaintiffs could not have reasonably relied on a form promise not to conduct a foreclosure sale while the review process was underway, when this promise was sent nearly a month after the

21

foreclosure sale, and more than two weeks after Plaintiffs became aware of the sale.

Furthermore, the language quoted above clearly warned Plaintiffs that they may have to respond to posted notices and/or take other actions to protect their home while the review process was underway.  This further supports the Court's conclusion that any claimed reliance on this November 2012 promise that may have resulted in Plaintiffs not taking action to save their home or attempting to redeem the property post-sale was unreasonable.  And to the extent Plaintiffs did take action, they fail to explain how they relied to their detriment on the November 2012 promise at issue.

Lastly, Plaintiffs point to a September 1, 2012 letter from Ocwen as evidence of the promise to adjourn the foreclosure sale.  See Second Am. Compl. ¶ 29 (alleging that Ocwen's representative asked for additional documents on September 1, 2012, and made "representations that the foreclosure sale scheduled for September 6, 2012, was adjourned").  Although Plaintiffs did not include this letter with their Complaint, they attached it to their response to Defendants' motion to dismiss.  See 9/1/2012 Letter (Dkt. 50-4).  The letter promises that, if Plaintiffs submit the requested forms and documents, Defendants, "[w]hile . . . consider[ing] [Plaintiffs'] request, will not initiate a new foreclosure action and . . . will not move ahead with the foreclosure sale on an active foreclosure as long as [they] received all required documents and [Plaintiffs] met the eligibility requirements."  Id.  Plaintiffs allege that they submitted the requested documents, but that the foreclosure sale nevertheless occurred on October 25, 2012 — before Ocwen even considered Plaintiffs' renewed application.  See Second Am. Compl. ¶ 28-29; see also id. ¶ 37 ("Defendant Ocwen had already confirmed receipt, in September of 2012, of the requested documents").

Defendants argue that the Court should not consider the language of the September 2012 letter, because it was attached to Plaintiffs' response to the motion to dismiss, rather than their second amended complaint.  Defs. Reply at 4 n.6.  The Court rejects this argument.  In ruling on a Rule 12(b)(6) motion, courts may consider documents that are not attached to the pleadings, but that are "referred to in the complaint and central to the plaintiff's claim."  See Greenberg v. Life Ins. Co. of Virginia, 177 F.3d 507, 514 (6th Cir. 1999) (internal citations omitted).[8]  Here, the September 2012 communication is both referred to in the second amended complaint, see Second Am. Compl. ¶¶ 28-29, 37, and is central to Plaintiffs' claim that Defendants promised to adjourn the foreclosure sale.  The document also was included in response to Defendants' argument that no signed writing existed evidencing such a promise that could support Plaintiffs' claim for relief.  Accordingly, the Court concludes that it can properly consider this document.

Next, Defendants claim that the September 2012 letter is insufficient to withstand the statute of frauds, because it does not contain the signature of an authorized representative.  See Defs. Br. at 11.  The Court disagrees.

Michigan's statute of frauds for financial institutions requires a writing "signed with an authorized signature by the financial institution."  Mich. Comp. Laws § 566.132(2).  Whether a contract is "signed" depends on whether the party intended to authenticate the writing.  "[A]ny symbol executed or adopted by a party with the present intent to authenticate a writing may serve as a signature."  Jim-Bob, Inc. v. Mehling, 443 N.W.2d 451, 458 (Mich. Ct. App. 1989).  The September 2012 letter in this case is written on letterhead bearing Ocwen's name and website, and contains Ocwen's contact phone number and address.  Notably, the letter contains the words "Sincerely, Ocwen Loan Servicing, LLC" at the bottom.  See 9/1/2012 Letter (Dkt. 50-4).

---

[8]   Defendants are well aware of this rule, having cited it (and the corresponding authority) themselves in a past motion to dismiss in this case.  See Defs. Br. at 1 n.1, 4 (Dkt. 14).

Finally, there is no indication that Ocwen intended any further action on its part — such as an additional signature by one of its representatives — before the promise to adjourn the foreclosure sale became effective. This cluster of facts is sufficient to raise an inference that Ocwen intended to authenticate the letter as embodying an enforceable promise.

The Court recognizes that there are non-binding court decisions in this circuit that have concluded that the phrase "Sincerely, [Servicer Name]" on the bottom of a cover letter is insufficient to satisfy the "authorized signature" requirement of the statute of frauds.  See Trombley v. Seterus, Inc., No. 12-15676, 2014 WL 1664823, at *5 (E.D. Mich. Apr. 25, 2014); Super v. Seterus, Inc., No. 13-11626, 2014 WL 902827, at *3-4 (E.D. Mich. Mar. 7, 2014) (typefaced name of lender does "not fall within the 'authorized signature' requirement in the statute of frauds").  However, the Court does not find those cases persuasive here for a number of reasons.

First, some of those cases are distinguishable from the instant action, because the borrowers in some of those cases sought to enforce a statement or promise contained within an unsigned agreement attached to a signed cover letter.  In other words, the challenged promise was not set out in the signed cover letter itself.  See, e.g., Trombley, 2014 WL 1664823, at *5; Rummell v. Vantium Capital, Inc., No. 12-10952, 2012 WL 2564846, at *6 (E.D. Mich. July 2, 2012) (seeking to enforce the "Trial Period Plan" that was attached to cover letter); Brady v. Chase Home Fin., LLC, No. 11-838, 2012 WL 1900606, at *8 (W.D. Mich. May 24, 2012) (same).  Here, on the other hand, Plaintiffs are seeking to enforce a promise contained within the signed document, i.e., a promise detailed in the cover letter.

Second, here, unlike in most of the cases above, there is no indication that Defendants intended that any further action on their part — signature or otherwise — be required before the

24

promise to adjourn the foreclosure sale became effective. Rather, all that was required was that Plaintiffs submit the necessary materials, a requirement that Plaintiffs allege that they met. See Trombley v. Seterus Inc., -- F. App'x --, 2015 WL 3620412, at *2 n.2, 5 (6th Cir. June 11, 2015) (while "presum[ing] that the phrase 'Sincerely, IBM Lender Business Process Services, Inc[.]' was intended as a 'signature' of the cover letter by Seterus," the court declined to enforce unsigned modification agreement attached to the cover letter, because the modification agreement contained blank signature lines for both the borrower and the servicer, which would have been "pointless" if the "signature line on the accompanying cover letter was intended to bind Seterus to the [attached] Modification.").[9]

Third, the Court concludes that the cases that insist on the personal signature of some identifiable individual graft an unjustifiable requirement onto the Michigan statute based on a misinterpretation of Michigan case law.  The cases referenced above suggest that the only way to satisfy the statute of frauds is to identify a document containing the signature of an "authorized representative," which the decisions imply means the personal signature of an individual agent. Under this reasoning, an authorized representative's inclusion of a typed entity-servicer's name is insufficient.  These cases generally reach this conclusion based on the following language from Cadle Company II, Inc. v. P.M. Group, Inc., No. 275099, 2007 WL 3119569, at *2 (Mich. Ct. App. Oct. 25, 2007): "[A]ny modification or waiver of the guaranty [at issue] is not enforceable unless it is in writing and signed by an authorized representative of Fifth Third

---

[9] Defendants' reliance on Goss v. ABN AMRO Mortgage Group, 549 F. App'x 466 (6th Cir. 2013); Federal Home Loan Mortgage Corp. v. Hassell, No. 11-14564, 2013 WL 823241, at *6-7 (E.D. Mich. Mar. 6, 2013); Ellis v. Chase Home Finance, LLC, No. 14-11186, 2014 WL 7184457, at *6-7 (E.D. Mich. Dec. 16, 2014); Garcia v. Federal National Mortgage Ass'n, No. 13-1259, 2014 WL 2210784, at *5-7 (W.D. Mich. Apr. 30, 2014); and Voydanoff v. Select Portfolio Servicing, Inc., No. 298098, 2011 WL 6757841, at *6-7 (Mich. Ct. App. Dec. 22, 2011), is not persuasive for these same reasons.

Bank." See Helmus v. Chase Home Fin., LLC, 890 F. Supp. 2d 806, 813 (W.D. Mich. 2012) (citing Cadle Co. II, Inc.); Brady, 2012 WL 1900606, at *8 (same).

However, the court in Cadle Company II, Inc. did not state that the "authorized representative" must sign the document in his or her name. In Cadle, the defendant's president signed an unlimited personal guaranty in 2002 that stated, in relevant part, "In consideration of any credit or other financial accommodation heretofore or hereafter extended by [Fifth Third Bank] . . . to [the defendant], [the president] guarantees prompt payment when due. . . . The indebtedness includes any and all indebtedness and obligations now or hereafter owing to [Fifth Third Bank]." In 2004, Fifth Third Bank and the defendant executed a revolving note, on which Fifth Third Bank claimed defendant subsequently defaulted. Fifth Third Bank subsequently filed suit, claiming that the defendant's president was responsible for payment of the 2004 note pursuant to the 2002 guaranty. The defendant's president responded by arguing that Fifth Third Bank had waived or modified the provision in the guaranty specifying that it extended to all future debts, as purportedly evidenced by "an agreement that [the] 2004 note was a stand alone note not guaranteed by the June 2002 guaranty." Cadle Co. II, 2007 WL 3119569, at *1.

The Michigan Court of Appeals concluded that this alleged agreement modifying or waiving the 2002 guaranty as to the 2004 note was unenforceable under Michigan's statute of frauds. The court noted that the 2002 guaranty was a financial accommodation covered by Michigan Compiled Laws § 566.132(2), and, therefore, "any modification or waiver of the guaranty is not enforceable unless it is in writing and signed by an authorized representative of Fifth Third Bank." Id. at *2. The court highlighted that "[t]he undisputed evidence discloses that no authorized representative of Fifth Third Bank signed such a modification or waiver." Id. Therefore, the court declined to enforce the alleged modification or waiver.

However, the terse, unpublished opinion does not describe the alleged waiver or modification agreement.  It cannot be determined whether there was no writing at all, or whether there was a written agreement without any authenticating symbol, or whether the bank's name did appear on the document but it lacked the cursive signature of an individual bank official. Thus, Cadle does not hold that an individual's personal signature must be affixed to the writing.

Fourth, to adopt Defendant's construction of the statute would torture its language.  The statute requires that the writing be "signed with an authorized signature by the financial institution." Mich. Comp. Laws § 566.132(2) (emphasis added).  The language does not say that the writing must be signed by an individual, or that a cursive signature must be employed. Courts should not graft language onto a statute that goes beyond its natural reading.  PIC Maintenance, Inc. v. Dep't of Treasury, 809 N.W.2d 669, 674 (Mich. Ct. App. 2011) (courts should not "read words into the plain language of the statute"); see also People v. Carey, 170 N.W.2d 145, 147 (Mich. 1969) ("The Court can only give full effect to the plain meaning of the term as used in the statute and cannot read into the law a requirement that the law-making body has seen fit to omit.").

Fifth, insisting on a personal signature would depart markedly from the long history of the statute of frauds under which a "signature" could include any notation signifying adoption or assent to being bound.  See 4 Corbin, Contracts § 23.4, pp. 789-798; 72 Am. Jur. 2d Statute of Frauds § 257 ("[T]he general rule [is that the signature may be] typewritten or printed mechanically, if, but only if, by signing in any of these methods the party whose signature is essential intends to authenticate the instrument as his act."); 37 C.J.S. Statute of Frauds § 204 (1943) ("Where employed with intent to authenticate the writing, a printed, stamped or typewritten signature will satisfy the requirements of the statute of frauds."); Restatement

(Second) of Contracts § 134 (1979); <u>see</u> <u>also</u> Mich. Comp. Laws § 440.1201(kk) ("'Signed' includes any symbol executed or adopted by a party with present intention to adopt or accept a writing."). While the statute of frauds for financial institutions was meant to broaden the <u>kinds of promises</u> that had to be in writing, nothing in the wording of the statute suggests that the standards for determining whether there was a <u>sufficient</u> <u>signature</u> had been made more stringent. <u>Compare</u> Mich. Comp. Laws § 566.132(1) (for the ordinary statute of frauds, promises must be "in writing and signed with an authorized signature by the party to be charged"), <u>with</u> Mich. Comp. Laws § 566.132(2) (for the statute of frauds for financial institutions, promises must be "in writing and signed with an authorized signature by the financial institution"). Nor have Defendants identified any legislative history that would lead to a contrary conclusion.

Finally, adopting a heightened stringency for signatures would promote unjust results. Consumers and seasoned merchants alike are used to being tendered documents containing promises — such as form contracts, warranties, quotes and invoices — that close with only a printed company name, rather than the personal handwritten signature of an individual. Defendants' theory would mean that lenders could make detailed promises to customers and affix the lender's name, and deceive even the most sophisticated customer into believing that an enforceable promise had been made and could be relied upon.

Can it really be imagined that the Michigan Legislature intended that a lender would escape liability for its promises by having an authorized representative affix the typewritten name of the servicer-institution — rather than the handwritten name of the representative himself or herself — below the word "Sincerely" on a form document printed on the lender's letterhead? This recipe for ensnaring the unwary would convert the statute of frauds into a statute <u>for</u> frauds, and undermine its fundamental purpose of "'preventing fraud or an opportunity for fraud.'"

Kent v. Bell, 132 N.W.2d 601, 654 (Mich. 1965) (quoting Hunter v. Slater, 49 N.W.2d 33, 35 (Mich. 1951)) (statute must not be interpreted so as to become "an instrumentality to be used in aid of fraud or as a stumbling block in the path of justice"); see also FEI Co. v. Republic Bank, S.E., No. 268700, 2006 WL 2313612, at *2 (Mich. Ct. App. Aug. 10, 2006) (same).

For purposes of the instant motion to dismiss, Defendants do not dispute that an authorized representative (i) included the typewritten "Sincerely, Ocwen Loan Servicing, LLC" on the bottom of the September 2012 letter, (ii) printed the letter on Ocwen's letterhead, and (iii) sent it to Plaintiffs on Ocwen's behalf.  In light of the above arguments, and given that compliance with Michigan's statute of frauds is decided on a case-by-case basis, Kelly-Stehney & Assocs., Inc. v. MacDonald's Indus. Prods., Inc., 693 N.W.2d 394, 398 (Mich. Ct. App. 2005), the Court concludes that the letterhead, closing statement, and contact information combined are sufficient in this case to satisfy the "signature" requirement for purposes of a motion to dismiss regarding promises made in the letter.  See Frost v. Wells Fargo Bank, N.A., 901 F. Supp. 2d 999, 1007 (W.D. Mich. 2012).  Accordingly, the Court rejects Defendants' argument that the statute of frauds necessarily disposes of Plaintiffs' claim.

Defendants next claim that the Court should dismiss this cause of action, because Plaintiffs' interest in the property was extinguished upon expiration of the statutory redemption period.  Defs. Br. at 16-17.  As this Court explained in a past decision in this case, a plaintiff may seek to set aside a foreclosure sale even after the redemption period has run, so long as the plaintiff can show a fraud or irregularity relating to the foreclosure process.  See Etts v. Deutsche Bank Nat'l Trust Co., No. 13-11588, 2014 WL 645358, at *5 (E.D. Mich. Feb. 19, 2014).  The Court concludes that Plaintiffs' allegation regarding a promise (and subsequent failure) to adjourn the foreclosure sale fits within this rule.  Michigan's statutory requirements for

conducting foreclosures by advertisement contain detailed notice requirements to ensure that borrowers are aware of the sale, have a chance to purchase the property at the sale, and are aware of the timeline for redemption.  See Mich. Comp. Laws § 600.3208, et seq.  To that end, the statutes set forth specific requirements for adjourning a foreclosure sale, including notice requirements.  See Mich. Comp. Laws § 600.3220.  Were this not the case, the initial notification requirements for conducting a foreclosure sale would have no meaning, as a lender could simply set a date and then continually adjourn it until the borrowers no longer knew of the sale, and therefore lost the right to attempt to purchase the property and/or redeem within the statutorily defined period.

Here, Defendants allegedly promised to adjourn the foreclosure sale pending a review of Plaintiffs' request for a loan modification.  Yet, Plaintiffs claim that Defendants moved forward with the sale on October 25, 2012, while Plaintiffs believed the review was still pending.  If true, this undermined both the statutory requirements and intention behind the notice requirements for conducting a foreclosure by advertisement.[10]  Therefore, the Court concludes that the alleged broken promise to adjourn the foreclosure sale is a potential irregularity arising out of the foreclosure process, not just an issue concerning the loan modification negotiations.

Furthermore, Plaintiffs sufficiently allege that they would have been in a better position to preserve their interest in the property, but for the alleged promise to adjourn the foreclosure sale during the review period.  See Kim v. JPMorgan Chase Bank, N.A., 825 N.W.2d 329, 331 (Mich. 2012).  Plaintiffs claim that, because of this promise, they "forewent other opportunities

---

[10]  Notably, Defendants attached the sheriff's deed, with the notices of foreclosure included, in support of a past motion to dismiss.  See Sheriff's Deed (Dkt. 14-6).  These notices reflected an originally scheduled sale date of September 6, 2012, and an actual sale date of October 25, 2012, without any notices of adjournment in between.  This supports Plaintiffs' claim that Defendants adjourned the sale as promised, but subsequently rescheduled it without notice to Plaintiffs.

to save their home, such as seeking another type of loan modification, refinancing the existing loan, pursuing a short sale, restructuring under the bankruptcy code or renting the property and relocating."   Second Am. Compl. ¶ 45.   The Court concludes this is sufficient to survive a motion to dismiss in this case.

Defendants next suggest that Plaintiffs cannot rely on alleged promises to adjourn the foreclosure sale pending review, because "Defendants performed every obligation that they colorably promised."  Defs. Br. at 16.  Defendants argue that the documents "establish that the October 25, 2012 foreclosure did not occur during a review period, because the review had already been completed by April 29, 2011."  Id.  As described above, this is true regarding the alleged written promises that Plaintiffs rely on from before April 29, 2011.  But Plaintiffs also seek to enforce the promise to adjourn that is contained in the September 2012 letter, which pre-dates the foreclosure sale and post-dates the April 29, 2011 completion of the original review.  In other words, taking all inferences in Plaintiffs' favor, Defendant Ocwen agreed to undertake a new review in September 2012, but foreclosed one month later — before that review was competed.  Accordingly, the October 2012 foreclosure may have occurred during a review period.

Finally, Defendants argue that laches should bar Plaintiffs' claim, because Plaintiffs could have included this cause of action in its original or amended complaints.  Defs. Br. at 20-22.  Defendants claim that, at latest, Plaintiffs should have been aware of this claim by the date of the sheriff's sale, October 25, 2012.  Id. at 21.  However, "[f]or laches to apply, inexcusable delay in bringing suit must have resulted in prejudice."  Tenneco Inc. v. Amerisure Mut. Ins. Co., 761 N.W.2d 846, 864 (Mich. Ct. App. 2008) (citations omitted).  Defendants have not alleged or shown how they were prejudiced by Plaintiffs bringing this claim for the first time in the second

amended complaint.  Instead, Defendants focus on Plaintiffs' failure to "allege [a] reason for their inexcusable delay." Defs. Br. at 22.  This is insufficient.

Therefore, having carefully reviewed Defendants' arguments in support of their motion to dismiss, the Court concludes that Plaintiffs have stated a valid claim for promissory estoppel based on Defendant Ocwen's September 1, 2012 written promise to adjourn the foreclosure sale pending a loan modification review.  This claim may proceed.

## V.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss (Dkt. 47).  Plaintiffs may proceed only with their claim for promissory estoppel, to the extent this claim is based on the promise to adjourn the foreclosure sale that is contained in the September 1, 2012 letter from Ocwen.  The Court dismisses all of Plaintiffs' remaining claims with prejudice.

SO ORDERED.

Dated:  August 25, 2015                    s/Mark A. Goldsmith
Detroit, Michigan                          MARK A. GOLDSMITH
                                           United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on August 25, 2015.

                                           s/Carrie Haddon
                                           Case Manager