# EXHIBIT 8

```
                                    H0276980.TXT
0001
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3
 4   TROY ETTS and LEA ETTS,
 5                  Plaintiffs,
 6        vs.                      Case No. 13-11588
 7                                 Hon. Mark A. Goldsmith
 8   DEUTSCHE BANK NATIONAL TRUST
 9   COMPANY, as trustee for
10   Securitized Asset Backed
11   Receivables, LLC, Trust 2004-
12   NCI, Pooling and Servicing
13   Agreement dated as of April 1,
14   2004; and OCWEN LOAN SERVICING,
15   LLC,
16                  Defendants.
17   _____
18
19
20        The Deposition of LEA ETTS,
21        Taken at 455 East Eisenhower Parkway,
22        Ann Arbor, Michigan,
23        Commencing at 10:36 a.m.,
24        Monday, August 31, 2015,
25        Before Dora L. Benson, CSR-6110.
0002
 1   APPEARANCES:
 2
 3   KELLI C. MEEKS
 4   Level one Legal Services
 5   455 East Eisenhower Parkway
 6   Suite 240
 7   Ann Arbor, Michigan  48108
 8   (734) 274-4329
 9   Kmeeks@levelonelegal.com
10        Appearing on behalf of the Plaintiffs.
11
12   DEBORAH S. LAPIN
13   Hertz Schram
14   1760 South Telegraph Road
15   Suite 300
16   Bloomfield Hills, Michigan  48302
17   (248) 335-5000
18   Dlapin@hertzschram.com
19        Appearing on behalf of the Defendants.
20
21   ALSO PRESENT:
22   Troy Etts
23
24
25
0003
 1                  TABLE OF CONTENTS
 2
 3   Witness                              Page
 4   LEA ETTS
 5
 6   EXAMINATION
 7   BY MS. LAPIN:                         4
 8   EXAMINATION
 9   BY MS. MEEKS:                       142
10   RE-EXAMINATION
```

H0276980.TXT

```
20         kids are little, and I wouldn't want to make them go
21         through that to give their dad bone marrow, because
22         they most likely are a match. And so they would need
23         to wait until they're adults --
24   Q.   That's fine.
25   A.   -- to do that.
0040
 1   Q.   Let's just do this.
 2                  What is -- what's the amount of Social
 3        Security Disability that your husband gets every
 4        month?
 5   A.   He gets, like -- I think it's, like, $900 a month.
 6   Q.   Okay.
 7   A.   I believe. I can't say specifically. It might be,
 8        like, 901 something.
 9   Q.   Has that been consistent since he went on it?
10   A.   It raised a little bit.
11   Q.   Okay.
12   A.   Not much. Like, maybe $20 or something.
13   Q.   And you said that that started coming in in
14        approximately 2009?
15   A.   Later in 2009.
16   Q.   Right. Right.
17   A.   Because that's a five-month wait period --
18   Q.   Right. Right.
19   A.   -- for that as well, so --
20   Q.   Okay. So let's say late --
21   A.   So it was, like, August or September of 2009 I
22        believe.
23   Q.   All right. And then what -- how would that compare
24        to -- and I don't mean for you to give me an absolute
25        100 percent estimate.
0041
 1   A.   Uh-huh.
 2   Q.   What had your husband -- prior to his getting sick --
 3   A.   Uh-huh.
 4   Q.   -- what had been his average salary per year?
 5   A.   I -- I'd have to look back at tax returns.
 6   Q.   Okay.
 7   A.   And also because, you know, that was so long ago
 8        that --
 9   Q.   Okay.
10   A.   -- I would have to look at that.
11   Q.   Did anybody direct you to stop making the loan
12        payments when you stopped in 2011?
13   A.   There was a time when something happened where it was
14        mentioned about that, but I didn't -- you had to be
15        behind in payments or, you know -- somebody mentioned
16        something about that, but I didn't do it and I didn't
17        stop. I made the payments that I was supposed to be
18        making.
19   Q.   I guess my question is -- and I appreciate that you
20        were very clear. You think you last made a mortgage
21        payment in April or May of 2011?
22   A.   Yeah.
23   Q.   My question was did anybody direct you to stop making
24        those payments? And if you don't recall --
25   A.   Yeah, I don't recall.
0042
 1   Q.   -- you don't recall.
 2   A.   Yeah. I can't recall specifically about that, because
 3        I had to go and get a -- in 2011 -- I guess I
 4        misunderstood that.
```

Page 17

```
                               H0276980.TXT
0064
 1           Orleans that said that they never -- any of them that
 2           said we didn't review your documents -- that told you
 3           that?
 4      A.   Repeat that again.
 5      Q.   Sure.  Do you have any documentation from Ocwen,
 6           Litton or Orleans that said to you, thank you, we
 7           didn't -- we didn't review your documents?
 8      A.   I don't think so.
 9      Q.   Okay.  Page -- paragraph 44 says Defendant Ocwen
10           likewise failed to honor its direct and various
11           representations and assurances that a review of the
12           loan for the modification would occur and no
13           foreclosure would proceed during the process when it
14           executed foreclosure sale upon plaintiffs' home during
15           the pending modification process.
16                      I am just trying to get the date of
17           these -- what says here direct and various
18           representations and whether those are in writing other
19           than what we've already discussed.
20      A.   And your question in regards to that is again?
21      Q.   My question is, I'm just trying to break down the
22           names of the representative and the dates of the
23           communication and whether they were oral or writing or
24           both.
25                      MS. MEEKS:  To the extent the question
0065
 1           seeks any information preceding September 1, 2012, I'm
 2           going to object to relevance, form and foundation.
 3                      THE WITNESS:  And I thought I had said that
 4           before.  I can't specifically say exactly who or --
 5      BY MS. LAPIN:
 6      Q.   That's fine.
 7      A.   -- what dates.  I know -- I know of September 12th
 8           when --
 9      Q.   We're going to get to that.  Yeah.  Yeah.
10      A.   Okay.
11      Q.   That's all I'm trying to get to.
12      A.   I know that -- yeah.  And we had an attorney.  Yep.
13      Q.   And that attorney, tell me again what the date of his
14           retention was?
15      A.   It was around August -- July or August.
16      Q.   2011?
17      A.   2011, yeah.
18      Q.   Okay.  Okay.  And what was the date that he ceased --
19           you ceased his representation?
20      A.   I believe it was -- I need to -- I would have to look
21           specifically, but I believe it was September 5th,
22           2012.
23      Q.   Stein ended?
24      A.   Correct.  Because the foreclosure was not to proceed.
25           And we no longer needed him because --
0066
 1      Q.   I was going to say, why did you end your relationship
 2           with him?
 3      A.   Because -- because of the conversation between Ocwen,
 4           myself and Russell Stacks, is that I -- they were
 5           going to review for a loan modification.  I was on the
 6           phone with them, and they did a whole -- with Russell
 7           Stacks, a three-way phone call --
 8      Q.   And Erik?
 9      A.   No.
10      Q.   Oh, it was you just --
                                Page 27
```

H0276980.TXT

```
11   A.   Me -- myself, Russell Stacks and that, because --
12   Q.   And you said it was a Monroe County sheriff who also
13        was in on this three-way conversation?
14   A.   No.  Erik Stein had called him to make sure that the
15        sale wasn't going to proceed, because I had talked to
16        the representative, and they sent me the -- me the
17        loan modification papers.  And we have that date right
18        here.
19   Q.   All right.  And what representative was it that you
20        talked to?
21   A.   It would be in the notes of who we spoke to.
22   Q.   Okay.
23   A.   Because that is documented.  HUD has that as well.
24   Q.   Okay.
25   A.   And Russell Stacks was on the three-way phone call.
0067
 1        He initiated the phone call from his line.
 2   Q.   With someone from Ocwen you're saying?
 3   A.   Yes.
 4   Q.   Okay.  That's what I was confused about.
 5   A.   Yes.
 6   Q.   And you said it was a man from Ocwen; right?
 7   A.   Yes.
 8   Q.   Okay.  But it was not Mr. Kumar?
 9   A.   I can't say for sure if it was or not.  I can't
10        recall.
11   Q.   Do you have Russell Stack's contact info?
12   A.   Yes.
13   Q.   Do you have that at home or do you have that with you
14        now?
15   A.   I don't know.  I gave it to my attorney.
16   Q.   Okay.
17             MS. MEEKS:  I can get that for you.
18             MS. LAPIN:  All right.  That's fine.
19   BY MS. LAPIN:
20   Q.   Have you talked to him recently?
21   A.   No.
22   Q.   Have you talked to Erik Stein recently?
23   A.   No.
24   Q.   So let me ask you this.  So you ended your
25        relationship with Erik Stein because you thought there
0068
 1        was not going to be a foreclosure, and then you did
 2        learn that there was a foreclosure?
 3   A.   After it already happened.
 4   Q.   Right.  Did you go back to Stein?
 5   A.   No.
 6   Q.   Because you feel --
 7   A.   Yeah.
 8   Q.   Okay.  You weren't satisfied?
 9   A.   Obviously not.
10   Q.   Okay.  Okay.  Right.
11   A.   Because when something wasn't --
12   Q.   Right.  I understand that.  Okay.
13   A.   Yeah.
14   Q.   Okay.  Was there anything that -- in writing that
15        memorialized this conversation?  Did you get any --
16        any letter?  I know what we have on the September 2nd,
17        and we're going to get to that.  But is there anything
18        other than that September 2nd that would have said
19        there's not going to be a foreclosure sale?
20   A.   The phone conversation.
21   Q.   I'm talking about in writing.
```

Page 28

H0276980.TXT

```
14   A.   No.  He did it as a representative --
15   Q.   Right.
16   A.   -- for me as -- because that's what I believe HUD
17        does, is they -- they --
18   Q.   And you didn't -- you don't -- so I'm just trying to
19        clarify.  You don't know the number he called for
20        Ocwen?
21   A.   I can't say for sure.
22   Q.   Right.
23   A.   I mean --
24   Q.   Right.  Right.  Was that call that you had, was that
25        made on your landline or your cell phone, if you
0079
 1        recall?
 2   A.   I believe it was on my landline, because I don't think
 3        it would have been on my cell phone for that long of a
 4        time period, but I know at one time the phone was cut
 5        off and then he had to call me back and that had
 6        happened, but -- yeah.
 7   Q.   Okay.  Yeah.  If you -- I'd like, if you can recall,
 8        the name of that Ocwen person.  If you can't, you
 9        can't.
10   A.   Well --
11   Q.   But you don't think it was Mr. Kumar?
12   A.   I don't -- not on that date.  I don't --
13   Q.   Right.
14   A.   I can't say for sure.  I really can't.
15   Q.   It was a man though?
16   A.   I believe it was a man.
17   Q.   Okay.
18   A.   I can't -- I don't want to say for sure about the
19        Kumar person because I just don't know specifically if
20        that's who it was on the phone.
21   Q.   Okay.
22   A.   I have to be sure that that was him, but I'm sure
23        they'll have note of who did this.
24   Q.   Okay.  And so this was sent to you?
25   A.   Uh-huh.
0080
 1   Q.   And then you got this and you called Mr. Stacks as a
 2        result of this e-mail?
 3   A.   No.  I got this after the phone call with Mr. Stacks.
 4   Q.   Oh, you got this e-mail from Ocwen after?
 5   A.   Yeah.
 6   Q.   Okay.
 7   A.   This is the result of.  The conversation was that I
 8        was going to be reviewed for a loan modification.
 9   Q.   Okay.
10   A.   They said that --
11   Q.   So --
12   A.   -- I would be reviewed.
13   Q.   All right.  I'm just trying to be clear.
14             So that conversation could have been on
15        September 1st --
16   A.   Uh-huh.
17   Q.   -- or maybe, like, a day or two before?
18   A.   Uh-huh.  Yes.
19   Q.   Okay.
20             MS. MEEKS:  Yeah.  I just want you to
21        answer out loud.
22             THE WITNESS:  Yes.
23   BY MS. LAPIN:
24   Q.   Okay.  All right.  What are you looking at?  Are you
```

Page 33

H0276980.TXT

```
10            we consider your request we will not initiate a new
11            foreclosure action and we will not move ahead with the
12            foreclosure sale on an active foreclosure as long as
13            we have received all the required documents and you
14            have met the eligibility requirements.
15    A.      Uh-huh.
16    Q.      Wouldn't you agree that that doesn't result in a
17            promise?  There have to be two conditions met?
18                    MS. MEEKS:  Objection.  Form, foundation
19            and relevance.  Go ahead, Lea, if you understand the
20            question.
21                    THE WITNESS:  Could you repeat that then?
22  BY MS. LAPIN:
23    Q.      Sure.  I read that sentence --
24    A.      Uh-huh.
25    Q.      -- the second sentence under after you apply.  So it
0084
 1            says while we consider your request we will not
 2            initiate a new foreclosure action and we will not move
 3            ahead with the foreclosure sale on an active
 4            foreclosure as long as we receive all required
 5            documents and you have met the eligibility
 6            requirements.
 7    A.      Uh-huh.
 8    Q.      So I'm -- my question to you is --
 9    A.      Yes.
10    Q.      -- wouldn't you agree with me that that is not a
11            promise to do anything until you have satisfied -- or
12            there have been two conditions satisfied:  No. 1 being
13            documents -- required documents received and that
14            you're deemed eligible?
15                    MS. MEEKS:  I'll object to that.  It calls
16            for a legal conclusion as well.
17                    THE WITNESS:  Yeah.  Because in my opinion
18            it means that we're being reviewed and nothing can
19            happen.
20  BY MS. LAPIN:
21    Q.      Okay.
22    A.      And --
23    Q.      That's your interpretation of the document?
24    A.      And my interpretation is we are supposed to be
25            reviewed --
0085
 1    Q.      Okay.
 2    A.      -- and that we wouldn't be foreclosed on.  And I was
 3            waiting to hear that, but then we were foreclosed on.
 4            And I think it does -- I don't think that they're
 5            supposed to foreclose within a 90-day period being
 6            reviewed either as I looked at that further on later.
 7    Q.      Before this e-mail do you recall when your last
 8            written correspondence with Ocwen was?  Would you be
 9            able to have paperwork that would show that?
10    A.      Besides this?
11    Q.      Yes.  If this is dated September 1st, when is the last
12            time you would have received anything from them in
13            writing, if you recall?  And if you don't have the
14            document with you, I understand.
15    A.      Yeah, I can't recall specifically, but --
16    Q.      Okay.
17    A.      -- the foreclosure happened.
18    Q.      Right.  And then the next -- my same question would be
19            when was the last oral communication with somebody
20            from Ocwen right before September 1st, 2012, if you
```

Page 35

H0276980.TXT

```
13            they -- the quickest way for them to get it was going
14            to be the e-mail.
15       Q.   Right. Did you ever receive confirmation that all the
16            required documents were received?
17       A.   I -- I can't recall specifically right at this time.
18            I would have to -- I -- I believe so.
19       Q.   Okay.
20       A.   That -- I believe -- I believe that they received
21            everything because they didn't call and ask me for
22            anything, because I was -- on this letter it says no
23            news is good news. I was told not to send anything
24            else.
25       Q.   Okay. So you're saying that you didn't get a call or
0096
1             you didn't get a letter that said all the documents
2             were received; right?
3        A.   I don't believe so.
4        Q.   Okay.
5        A.   I -- I -- I can't recall that specifically though, and
6             I would have to look to see, but I believed we were in
7             a review process. They got it.
8                      Russell Stacks did call me a week later
9             though. He -- he did call a week later though, and I
10            think he checked back with them, but I would have to
11            look back on that too.
12       Q.   All right.
13       A.   You could probably get verification from him too,
14            because I think they did a follow-up.
15       Q.   Okay.
16       A.   If I recall correctly, if I'm thinking about this --
17            there's a lot of stuff that happened, but they did a
18            follow-up with them.
19                     MS. MEEKS: They did a follow-up with who?
20                     THE WITNESS: Russell Stacks did a
21            follow-up with Ocwen.
22                     MS. MEEKS: Thank you.
23                     THE WITNESS: And he also did a follow-up
24            with me and asked about did -- you know, did I do what
25            I was supposed to do following up with giving the
0097
1             documentation and everything like that, and I said
2             that I did.
3                      (Mr. Etts re-entered deposition room at
4                      12:10 p.m.)
5        BY MS. LAPIN:
6        Q.   Do you have any letters or anything from Russell
7             Stacks or was it more just conversations with him over
8             the phone?
9        A.   No. There was a conversation over the phone.
10       Q.   E-mails maybe?
11       A.   No. There was a letter sent that we used that -- that
12            we had to use the -- his services.
13       Q.   Okay. Did Ocwen ever tell you that you satisfied all
14            of the eligibility requirements?
15       A.   No. Because we were always in a review. I -- we were
16            still in the review process.
17       Q.   Okay.
18       A.   Or do you mean over the phone or what do you mean?
19       Q.   Well this said -- the letter says you're going to be
20            considered.
21       A.   Uh-huh.
22       Q.   Your eligibility will be considered. And I'm asking
23            you did Ocwen ever tell you, whether it was in writing
```

Page 40

H0276980.TXT

```
24              or oral, that you satisfied all of the eligibility
25              requirements?
0098
 1    A.        When we were on the phone, they did a financial over
 2              the phone to go to the next step.
 3    Q.        When?
 4    A.        You have to do a financial.
 5    Q.        When was that?
 6    A.        That was in September, the phone conversation that
 7              we're talking about between Russell Stacks and Ocwen.
 8              To be able to get to this next phase you have to be
 9              able to submit if you even are pre-qualified.
10    Q.        I guess I'm confused here, because I thought you had
11              the conversation and then you sent this in?
12    A.        Yes.  But they did a verbal over the phone.  Over the
13              phone they were asking for financials.
14    Q.        Okay.  That's fine.  My question is did they ever tell
15              you point-blank at anytime after September 1st, 2012
16              that you satisfied all of the eligibility
17              requirements?
18    A.        No.  Because I submitted everything.  I was --
19    Q.        You wouldn't know --
20    A.        -- wait for a response.
21    Q.        Okay.
22    A.        Right.  Because it was --
23    Q.        Okay.
24                       MS. MEEKS:  Just answer the question.
25                       THE WITNESS:  Okay.
0099
 1    BY MS. LAPIN:
 2    Q.        Do you have any evidence that Ocwen never considered
 3              your application that you sent in subsequent to
 4              September 1st, 2012?  And I'll qualify that.  If it's
 5              considered an application for purposes of this
 6              deposition, we'll say that it is.  Do you have any
 7              evidence that they never considered it?
 8    A.        They foreclosed.
 9    Q.        So your testimony is because there was a foreclosure
10              that meant they never considered it?
11    A.        Never heard back.
12    Q.        Okay.
13    A.        They foreclosed.  I thought we were in a review.  They
14              foreclosed on us.
15    Q.        Okay.  So -- and I had asked you this earlier.  You
16              don't have any written documentation that -- that --
17              from Ocwen that tells you, hey, we're not considering
18              your application?
19    A.        Do I have any evidence or --
20    Q.        Anything in writing.
21    A.        That they're not considering my application?
22    Q.        Correct.
23    A.        Not that I am aware of.
24    Q.        Okay.
25    A.        I've -- they sent a letter after the foreclosure
0100
 1              happened.
 2    Q.        We'll get to that.
 3    A.        Yeah.
 4    Q.        We'll get to that.
 5                       Paragraph 37 of the complaint -- second
 6              amended complaint rather -- says, at the end,
 7              Defendant Ocwen had already confirmed receipt in
 8              September of 2012 of the requested documents and no
```

Page 41

H0276980.TXT

```
12   Q.   You did not redeem the property?
13   A.   No.
14   Q.   Did you attempt to redeem the property?
15   A.   Did we attempt to redeem the property?
16   Q.   Yes.
17   A.   How so?  I mean, in what way?
18   Q.   I don't know.  I don't know.  Did you take any steps
19        to do that?
20   A.   Yes.
21   Q.   What did you take to attempt to redeem the property?
22   A.   We -- we retained legal counsel to try to --
23   Q.   Okay.
24   A.   -- resolve the situation.
25   Q.   Okay.  Let me ask it this way then.
0113
 1             Did anybody from Ocwen or Deutsche Bank
 2        prevent you from redeeming the property?
 3             MS. MEEKS:  I'll object to that.  It calls
 4        for a legal conclusion.  Form.  Foundation.  Go ahead.
 5             THE WITNESS:  Can you repeat that?
 6   BY MS. LAPIN:
 7   Q.   Sure.  Did anybody from Ocwen or Deutsche Bank, who
 8        you're suing in this lawsuit, prevent you from
 9        redeeming this property?
10   A.   I would say yes, because we -- we were trying to get a
11        loan modification, and so they prevented us from
12        redeeming the property because they didn't undo
13        anything that they had done.  I mean, I'm not sure if
14        I'm answering the question correctly, but that's --
15        when you say prevent, yes, they did.
16   Q.   Okay.  Did they tell you not to redeem?
17   A.   Did they tell us?
18   Q.   Yes.
19   A.   No.  Because I didn't speak to them.
20   Q.   Okay.  Did you have funds that were available to
21        you -- what I mean, I mean you and your husband --
22        that you could have used to redeem the property?
23   A.   No.  That's why we were filing for a loan
24        modification.  We had looked to file a loan
25        modification.
0114
 1   Q.   Okay.  So are you saying -- if you had the funds to
 2        redeem, would you have redeemed the property?
 3   A.   I can't answer that question right now.
 4   Q.   I guess my -- my -- when I had asked you earlier about
 5        did you a attempt to redeem, was there any attempt
 6        that you go to Ocwen or Deutsche Bank and say, look,
 7        you want X amount to redeem, we're prepared to offer
 8        you a different amount?  Was there any negotiation
 9        like that?
10   A.   All our communication was through our attorney.
11   Q.   Okay.
12   A.   We didn't have any direct communication with Ocwen or
13        Deutsche Bank.
14   Q.   Okay.
15   A.   Everything was through Ms. Meeks.
16   Q.   Okay.  Did you consider an option of making any sort
17        of redemption payment?
18   A.   Are you talking about -- in what month?
19   Q.   During the six-month redemption period.
20   A.   Did we look at making a payment or --
21   Q.   Did you consider the option of redeeming the property
22        at all during the six-month redemption period?
```

Page 47

H0276980.TXT

```
23   A.   I can't really answer what I felt like or thought of
24        back in that time.  We were trying to redeem the
25        property because of the process in which it was
0115
 1        foreclosed upon, is where -- we looked to do.  Which I
 2        know is not relevant, but at the time it was relevant,
 3        because we felt like it was done -- and that's why we
 4        then sought out legal counsel to get that resolved.
 5   Q.   You knew you had a six-month redemption period;
 6        correct?
 7   A.   We were aware of that, but --
 8   Q.   Okay.
 9   A.   -- we also know it had to get -- it was -- I don't
10        know if you want to use the word prolonged or
11        whatever -- because the lawsuit didn't -- it wasn't
12        able to be condensed during that time.
13   Q.   Correct.  And you know that your lawsuit did not ask
14        for the redemption period to be continued?  Are you
15        aware of that?
16               MS. MEEKS:  I'll object.  Calls for a legal
17        conclusion.  Form.  Foundation.
18               THE WITNESS:  When you say that our lawsuit
19        didn't ask for the redemption period to be --
20   BY MS. LAPIN:
21   Q.   Extended.
22   A.   Okay.  I wouldn't be aware of if --
23   Q.   Okay.
24   A.   -- it was allowed to be or not.
25   Q.   Okay.
0116
 1   A.   Because that's why I have an attorney.
 2   Q.   Okay.
 3   A.   I don't know about that, but I know that we -- the
 4        lawsuit wasn't able to happen during that time period,
 5        so -- a resolution of.
 6   Q.   But, I mean, it seems too based on what you said
 7        earlier, redemption was not going to be likely anyway
 8        because of your financial situation?
 9   A.   We could -- we were looking to resolve the foreclosure
10        issue --
11   Q.   Correct.
12   A.   -- and redeem the property through those means.
13   Q.   Okay.  And I understand.  But I'm asking you
14        pointblank did you have the financial means to redeem
15        the property at anytime during the six-month
16        redemption period?
17   A.   I can't state exactly if that was even a -- what would
18        have been an option to us, because we were not of the
19        understanding to seek out remedies to make that happen
20        at the time, to ask people -- you know, ask for a loan
21        from somebody, anything along those lines, because in
22        my mind it -- it couldn't -- it isn't going to be able
23        to happen until we were in the lawsuit.  That's why we
24        had the lawsuit.
25               But I -- had I known, I could have asked or
0117
 1        something, but I didn't because we were in the
 2        lawsuit.  Also, the number of what -- the price of
 3        what we owed for the house was different than what --
 4        what was stated at the -- you know, at the sale, so --
 5   Q.   Did you ask anybody for a loan during that -- during
 6        the six-month redemption period?
 7   A.   No.  Because we were in the middle -- because we had
```

Page 48

H0276980.TXT

```
 4          once before, that you supplied documents and were told
 5          you couldn't get a loan modification.  So you knew it
 6          happened before, and I guess knowing that I don't
 7          understand -- or I guess I'm just questioning why you
 8          thought that there was such a guarantee, especially
 9          based on the writings which don't make a promise.
10                  MS. MEEKS:  I'll object to the form of the
11          question.  I don't think that it's ever been suggested
12          that there was a guarantee of a loan modification by
13          the Etts, nor is that claimed.  Go ahead, Lea.
14                  THE WITNESS:  Because when I would call
15          about that, then they would say to redo it again.  And
16          they would also send letters in the mail for us to
17          send letters.  You -- you may qualify for a loan
18          modification.
19     BY MS. LAPIN:
20     Q.   When are we talking about here?
21     A.   Several letters that I received even after -- in the
22          meantime and after the fact they would call.
23     Q.   What dates?  Are you talking --
24     A.   I would have to go back and look at those dates.
25     Q.   Are you talking before September 1st, 2012?
0123
 1     A.   Yes.
 2     Q.   Okay.  Okay.  Before -- have you ever tried to
 3          refinance the property?
 4     A.   No.  Because we were in a -- we did not try to
 5          refinance the property because we were in a loan
 6          with -- in the loan modification process and also
 7          because of the trial payments that I had made.  It put
 8          me further behind in the mortgage payments as it
 9          states on there, that I told you when I paid.  Their
10          clarification of the last time I paid is different
11          because of those three trial payments that I made.
12          And then I increased my payment thereafter and
13          submitted more documents, submitted more documents, so
14          I didn't try to refinance because --
15     Q.   So you have never tried to refinance the property,
16          say, from what, 2009 to the present then; is that what
17          you're saying?
18                  MS. MEEKS:  I'll object to the form and
19          foundation.  I guess we may need to clarify what you
20          mean by refinance.
21                  MS. LAPIN:  Well I'm going off what the
22          complaint says.
23                  MS. MEEKS:  Okay.  Which is?
24     BY MS. LAPIN:
25     Q.   You're saying that this foreclosure somehow prevented
0124
 1          you from refinancing the existing loan, and I just
 2          want to know what -- to me that contemplates you were
 3          considering a refinance, so how did the foreclosure
 4          prevent you from seeking a refinance?
 5                  MS. MEEKS:  I'm going to object to the
 6          characterization.  The allegation is that because the
 7          representation was made they would be reviewed for a
 8          modification they did not pursue those actions.  Had
 9          they known that no modification was even going to be
10          considered, then they would have pursued these other
11          options.
12                  MS. LAPIN:  Okay.
13                  MS. MEEKS:  So with that in mind --
14                  THE WITNESS:  Yes.
```

Page 51

H0276980.TXT

```
15   BY MS. LAPIN:
16   Q.   I'll disagree with that characterization, because you
17        never got a promise.  So my -- my question is you
18        never considered attempting to seek a refinance?
19   A.   I didn't because I thought we were being --
20   Q.   Reviewed.
21   A.   -- a loan modification.  I thought that we were going
22        to -- I was in the process of trying to get a loan
23        modification.
24   Q.   And there -- and so you knew -- you say you were in
25        the process of trying to get one.  You knew -- you --
0125
 1        you know you were not necessarily guaranteed that you
 2        were going to get one; correct?
 3   A.   Did I know I was guaranteed?
 4   Q.   Yes.
 5   A.   No.  I don't think that I said I was guaranteed, but I
 6        needed to be considered.  Reviewed.
 7   Q.   So what would have happened if you got -- if you had
 8        gotten something from -- you -- something from Ocwen
 9        that said you're not, and you say you didn't get that,
10        what would you have done?
11   A.   If I was -- they said stop sending me documents, don't
12        apply for a loan modification?
13   Q.   Yes.
14   A.   I would have done something different.
15   Q.   What would you have done?
16   A.   I don't -- I don't know because I can't speak of that
17        time because it didn't happen.  I can't go backwards.
18        I can only tell you what I felt in the moment, and my
19        sole focus was on listening to what they had to say
20        about a loan modification back -- from 2009 up until
21        2012.  And I did what they asked me to do, and I
22        believed what they were saying and I did what they
23        asked me to do.
24   Q.   Did you -- no one stopped you from going to talk to
25        another mortgage lender or, you know, a bank about a
0126
 1        refinance at anytime between 2000 -- January 1st, 2012
 2        and the time that the lawsuit was filed; correct?
 3   A.   Right.
 4   Q.   And what was your credit like in -- in, say, like, the
 5        fall of 2012; do you know?
 6   A.   Not good.  Because it was showing past -- you know,
 7        payments about this too, so --
 8   Q.   Were they showing -- but were they also showing past
 9        due payments on other -- on other --
10   A.   I'd have to look --
11   Q.   -- bills you had?
12   A.   -- back to see.
13   Q.   Okay.
14   A.   I can't recall specifically.
15   Q.   Do you even know if you would have qualified for a
16        refinance?
17   A.   Well since they were saying I hadn't made a payment
18        since 2010, I don't know that I would have.
19   Q.   Okay.
20   A.   But that's not true.
21   Q.   Who is telling you -- who told you you wouldn't have
22        qualified?
23                 MS. MEEKS:  I'll object to the question.
24        It calls for a legal conclusion or outside the scope
25        of this witness's knowledge.
```

H0276980.TXT

```
0127
 1              THE WITNESS:  But I didn't seek that
 2         remedy --
 3   BY MS. LAPIN:
 4   Q.   Okay.
 5   A.   -- because I thought that I was getting -- I know I'm
 6         sounding redundant.
 7   Q.   No.  No.  I understand what you're saying.
 8   A.   But because of the loan modification -- I wanted to
 9         have the loan modification with them and not have to
10         do anything else.  It was with them, you know --
11   Q.   I understand you chose not to seek a refinance review.
12         That's all I'm asking.
13   A.   Only because -- because Ocwen, and before that
14         Litton -- we were in a review process for a loan
15         modification.  You can keep applying for that.
16   Q.   Okay.  Even though it had not occurred before?
17   A.   Uh-huh.  I could go into more detail about it, but I'm
18         not --
19   Q.   No.
20   A.   -- going to because it's not relevant to the question.
21   Q.   Did you pursue a short sale?
22   A.   It wasn't offered to us.  One time I think that it was
23         offered but they -- they -- it wasn't Ocwen.  It was
24         Litton, and the paperwork came in afterwards.
25   Q.   Did you yourself go to talk to a Realtor and -- and --
0128
 1         at any point, say, between 2009 and the time of this
 2         foreclosure sale about doing a short sale?
 3   A.   Did I talk to a Realtor?
 4   Q.   Yes.
 5   A.   No.  The only -- not that I can recall.  I can't
 6         remember specifically if I talked to any Realtor, but
 7         not about a short sale because I didn't think that's
 8         who you talked to about it.
 9   Q.   Did you ever list your house for sale between 2009 and
10         the date of the foreclosure sale?
11   A.   I can't -- not with a Realtor or -- I can't recall.
12   Q.   Or on your own or you listed it for sale by owner.
13   A.   There was one time that we listed the house for sale
14         at one point, but that could have even been before
15         this.  I would have to look --
16   Q.   Okay.
17   A.   -- and see when that was, because we advertised, I
18         think, for a weekend.  And I can't remember if it was
19         before Troy got ill or after.  I can't remember.
20   Q.   So you never -- okay.  So a short sale was never on
21         your radar, so to speak --
22   A.   No.
23   Q.   -- in terms of this?
24   A.   Because when -- Titanium Solutions was then sent to
25         our home as well.  All this to get --
0129
 1   Q.   That was back in 2009?
 2   A.   -- to get me to -- no.  No.  They were sent again --
 3   Q.   When?
 4   A.   -- two other times --
 5   Q.   When?
 6   A.   -- by Litton.  In -- between 2010 and 2011.  Came to
 7         our home -- in fact, the man that sat at my table with
 8         me got a phone call with Litton.  I have that date
 9         specifically documented.
10   Q.   What's the date?
```

H0276980.TXT

```
11   A.   He came to us to apply for a loan modification.
12   Q.   What's the date, do you know?
13   A.   I would have to get that specifically to you.  I think
14        that it was on that log of paperwork that I had.
15   Q.   Okay.
16   A.   His name was Ernie Mull --
17   Q.   Monholland [phonetic]?
18   A.   Yes.
19   Q.   Okay.  That's on your witness list?
20   A.   He came to our house seeking for us to apply for a
21        loan modification.  He was hired by Litton to come to
22        us.
23   Q.   Okay.  I'm just asking, you never contemplated a short
24        sale?  Is that -- that's what I'm asking you; correct?
25   A.   No.  Because --
0130
 1   Q.   Okay.
 2   A.   -- I always thought about the loan --
 3             MS. LAPIN:  Just answer the question yes or
 4        no.
 5             THE WITNESS:  Yes.
 6   BY MS. LAPIN:
 7   Q.   Okay.  Okay.  And you said that you were considering
 8        bankruptcy?  Were you considering bankruptcy before
 9        the foreclosure?
10   A.   Yes.
11   Q.   Okay.  When were you considering bankruptcy?
12   A.   Right before I talked to the HUD counselor and Ocwen.
13   Q.   So what; around September 1st?
14   A.   Right before that.
15   Q.   Who -- did you speak to a bankruptcy attorney?
16   A.   Erik Stein.  The paperwork was in -- filled out and it
17        was going to be filed.  It was stopped because of
18        the --
19   Q.   Did you --
20             MS. MEEKS:  Wait.  Wait.  Finish your
21        answer please.
22             THE WITNESS:  It was stopped because of the
23        September 1st phone call with Ocwen and the HUD
24        counselor, and the loan modification and the
25        foreclosure sale was going to be stopped.  And that is
0131
 1        why I didn't continue with the bankruptcy, because I
 2        didn't need to.
 3   BY MS. LAPIN:
 4   Q.   So you -- you actually signed bankruptcy paperwork?
 5   A.   I can't remember if we signed -- it wasn't finalized.
 6        I would have to get the paperwork back from him again
 7        to see finalization, but we were in the process of --
 8        of doing it.  And we didn't.  I told them to stop, not
 9        to do it because we didn't need to anymore.
10   Q.   And how come you haven't done it since?
11   A.   We didn't need to.  I don't understand that question.
12   Q.   Okay.  I'm just asking you why didn't you file for
13        bankruptcy after you found out that the foreclosure
14        sale occurred up till even the present time?
15   A.   I guess I'm not understanding why --
16   Q.   Well, put it this way.
17             You found out that the foreclosure sale had
18        occurred; right?
19   A.   Uh-huh.  Right.
20   Q.   Why didn't you follow through with the bankruptcy at
21        that time?
```

Page 54

```
                              H0276980.TXT
 7    Q.    Well, I think one allegation or complaint is that
 8          there's been -- the foreclosure somehow prevented you
 9          from renting the property and relocating, and I just
10          want to know how did it do that?
11    A.    Options.  Opportunities and options of what we could
12          do.  I would -- maybe we could have left the property
13          and gone to live someplace else and rented the
14          property out for what our payment was until -- but
15          there wasn't an opportunity to do any of that.
16    Q.    Why wasn't there an opportunity to do any of that?
17    A.    The house was foreclosed on.
18    Q.    How did that prevent you from -- how did that prevent
19          you -- the act of foreclosing, how did that prevent
20          you from relocating your property and renting it out?
21    A.    So -- can you -- can you explain -- clarify to me what
22          you're asking?  Because I think I'm confused.
23    Q.    Sure.  Well, you're saying in this lawsuit that the
24          foreclosure and/or comment about looking to see if you
25          can get a loan modification somehow prevented you from
0135
 1          renting your property and relocating, and I'm trying
 2          to see how did that do that?
 3    A.    Well, because when -- for a loan modification you have
 4          to live on the property.  You can't get a loan
 5          modification if you rent the property out, so when I
 6          was --
 7    Q.    Who told you that?
 8    A.    Well, I believe that that's -- they always ask you if
 9          that's your primary residence for the property, and
10          you have to be -- that has to be your primary
11          residence to get a loan modification.  If I was -- I
12          don't see how -- I'm not -- anyways, I'll -- finish
13          the question.
14    Q.    Okay.  Because my question is based on something
15          you're saying in the complaint.
16    A.    Uh-huh.
17    Q.    You're saying that this prevented you from doing that,
18          so how did it prevent you from doing that if you were
19          not even going to consider doing it in the first
20          place?
21    A.    If we never -- because of the loan modification and
22          continuing to keep applying for the loan modification
23          I didn't look at any other options to do that because
24          that could have been an option, but I wasn't -- I kept
25          applying for a loan modification because I have to
0136
 1          live on that property.
 2    Q.    Okay.  Where did you ever -- did you ever consider
 3          relocating anywhere?
 4    A.    No.  Because I was in the process of --
 5    Q.    Okay.
 6    A.    I could have.  We could have moved with my dad,
 7          something.  But it wasn't an option because --
 8    Q.    Why wasn't it an option?
 9    A.    We were always --
10               MS. MEEKS:  One at a time.
11               THE WITNESS:  Okay.
12               MS. MEEKS:  Finish your answer, Lea.
13               THE WITNESS:  We were always in a loan --
14          we were always trying to seek the loan modification.
15    BY MS. LAPIN:
16    Q.    Correct.  But no one had ever told you as you were
17          going through this process that you were going to get
                              Page 56
```